ELLIS, Judge.
This suit arises out of a workmen’s compensation claim for the death benefits which was filed individually by Gracie L. Smith, and as the natural tutrix of the minor children of John B. Smith, Michael Joseph Smith and Jeffrey Lane Smith. This suit was filed on March 23, 1963, the case was duly tried before the Honorable Coleman Lindsey on January 21, 1964, dismissing the action of the plaintiffs against the defendant, New Amsterdam Casualty Company, and from this judgment the plaintiffs were granted a devolutive appeal.
The facts in this case were not substantially in dispute. Billy Carber testified that he had known the decedent since he was approximately nine years old and that he had worked on several other jobs with the decedent prior to April of 1962. He was going to work with the decedent on the morning of April 4, 1962, at which time he and the decedent were to do house painting at a subdivision being developed by their *257 employer, Ross Cox. About 7:45 A.M., Carber drove into the subdivision, saw the decedent’s station wagon parked and noticed the decedent standing on a scaffold painting underneath the front end of the house facing the street. While driving his car behind the decedent’s station wagon, he saw John B. Smith suddenly fall straight back, striking the ground flat on his back and he immediately ran to get help and called the doctor.
The superintendent for Ross Cox on April 4, 1962, was Ora Mitchell. He testified that Smith reported to work sometime between 7:00 A.M. and 7:30 A.M. and had not been painting more than thirty minutes when he heard someone calling that a man had been hurt, whereupon he hastened to the scene and saw the decedent lying on his back. There was no indication that the scaffold had moved and, as best Mitchell could recall, the bucket of paint was still on the scaffold, as well as the brushes. Another person who testified that he came to the scene soon after Smith fell was Frank Gibbs, who stated the decedent evidently had fallen from the scaffold without upsetting either the paint bucket or the scaffold which was two and one-half feet high.
Smith was taken to Our Lady of the Lake Hospital where he was initially examined by Dr. F. A. Dejean. He remained unconscious for several days following his admission. Dr. Dejean called in for consultation Dr. J. A. Sabatier who followed decedent until his discharge on April 21, 1962. As part of the diagnostic treatment, a spinal puncture was done for the purpose of obtaining xanthochromic fluid, which indicated there might be some bleeding somewhere along the surface of the brain.
From the history given of the fall, Dr. Dejean couldn’t determine with certainty whether the decedent had a brain hemorrhage or a simple fainting spell that caused his fall.
The decedent returned home where he did insignificant household tasks until July 23, 1962, when he suffered another episode resulting in his death the following day. An autopsy revealed the cause of death to be the rupture of a so-called Berry aneurysm in the brain.
Counsel for plaintiff has strenuously argued that the exertion by decedent coupled with the anxiety and tension that he experienced on his first day on the job was the precipitating cause of the ruptured aneurysm.
The evidence is clear that the decedent had been unemployed for some time prior to the job he obtained with Ross E. Cox Construction Company, and it is equally clear that he had not been working over one-half hour before he fell off the scaffold. It is also significant that neither the scaffold nor the paint bucket on the scaffold was upset.
We cannot attach any weight to the plaintiffs’ argument that the “first day jitters” caused the initial leakage of the aneurysm that eventually ruptured to such an extent that it caused Smith’s death. There was no lay testimony to support this contention; as a matter of fact, the record reveals he was happy to be working after a lengthy layoff. None of the facts indicate that Smith had performed any strenuous work for the employer and the medical testimony was not favorable to plaintiffs’ position. Although there was some language in the depositions of the doctors which, in a general sense, might sustain the plaintiffs’ contentions, the weight of the medical testimony does not. This was particularly true where the questions propounded dealt with specific rather than hypothetical facts.
Dr. Nunnally, the Pathologist who performed the autopsy on the decedent, testified that aneurysms can rupture spontaneously. It was his opinion that a fall such as the one in this case would be unlikely to have caused the rupture or the leakage and he did not think there was a relationship of cause between the accident and the rupture.
*258 Dr. Sabatier, a consulting physician who treated the decedent during the original onset of the leakage of the aneurysm in April 1962, felt the aneurysm was present from birth and that it was a congenital defect. He testified that aging would cause the defect to become progressively worse. It was his opinion that there was no causal connection between the work he was performing and the leakage of the aneurysm in April 1962 and that the leakage caused his fall. To quote his answer to a question concerning his work hastening his death, his answer was “miscroscopic”.
The original treating physician, Dr. De-Jean, testified he felt the leak in the aneurysm caused this fall. It was his opinion these types of aneurysms are usually undiagnosed and that they rupture without any warning.
None of this evidence contains the certainty required of a plaintiff to show a causal relationship between the physical breakdown and the employment.
In the case of Custer v. Higgins Industries, La.App., 24 So.2d 511, there was no question but that the normal duty of forcing a window open by placing his elbows on his stomach caused the rupture of plaintiff’s abdominal tumor to become symptomatic.
In the case of Biggs v. Libby-Owens-Ford-Glass Co., 170 So. 273, the court held that:
“Plaintiff’s right to recover is secured to him, even though his disability was not immediately caused by an unusual strain or physical effort, or some awkward movement of his body. It is sufficient for recovery that the affected parts of his body gave way while at work for defendant.”
However, in that case the plaintiff had been operated on for a rupture and later had passed a physical as being able to perform normal duties. Subsequent to this, he again suffered a hernia. The medical testimony supported plaintiff’s theory that even the normal work would aggravate the hernia.
The failure by plaintiffs to establish by a preponderance of the evidence a causal connection between the leakage on April 4, 1962 and the decedent’s work requires a dismissal of this suit.
For the reasons hereinabove assigned, the judgment of the lower court is affirmed.
Affirmed.